UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:17-cr-00573 ) ) |
| MITCHELL DAVIS, DC, | ) ) |
| Defendant. | ) |

### **DEFENDANT'S RENEWED MOTION TO COMPEL**

Comes now Defendant Mitchell Davis ("Dr. Davis") by and through his attorneys and renews his motion to compel discovery from the government, consistent with the Court's January 24, 2018, order. As described below, the government continues to wrongfully withhold promised discovery, this time not just in contravention of its promises, but also the Court's order.

### I. FACTS

Following Dr. Davis's plea of guilty to a two count Information, the government produced discovery to Dr. Davis relating to Count 1 and promised to produce "a large volume of discovery" related to Count 2 involving a false statements relating to health care matters charge. *See* Exhibit 1 to Defendant's Motion to Compel. Despite this promise, the government later reneged, and refused to produce the Count 2 discovery. *Id.* As a result, Dr. Davis was forced to file a Motion to Compel (the "Motion"), which was fully briefed and argued before the Court on January 24, 2018.

At the hearing on that Motion, the government made clear its position that it was not willing to disclose any interview reports related to Count 2, but did not specify *any* other categories of documents that it intended to withhold. The Court ordered the government to make available to Dr. Davis for inspection and copying all non-interview report discovery, and reserved a ruling on

the Count 2 interview reports until after the production of the remainder of the discovery, at which time it requested notice from the parties.

Following the hearing, Dr. Davis attempted to coordinate the production of the (non-interview report) discovery related to Count 2. Counsel emailed the government, stating "[w]e appreciate your willingness to allow us to inspect and copy all of the non-302 materials. I will stand by for your call as to when the discovery will be ready to inspect[.]" Exhibit 1 at 5, Jan. 24, 2018 email from S. Doran to D. McMurtry et al. This email was followed by a phone call with the government, during which time the government—effectively for the first time—explained what materials beside interview reports it had in the Count 2 "large volume of discovery" that it now intended to produce, and that counsel would not be able to view the materials until Friday, January 26, 2018.[1] Following those discussions, counsel again emailed the government to memorialize the phone conversations, stating counsel's understanding of the non-interview report discovery to be produced consistent with the Court's order:

> (1) records from insurance companies related to approximately 150 patients, though it will not include a spreadsheet of claims data reflecting the larger universe of invoices for treatment submitted by Dr. Davis, which we understand does not exist;
>
> (2) bank records, consisting of a mix of hard copy and disks;
>
> (3) recordings of conversations between undercover sources and Dr. Davis, which number around 200 and are stored on disks; and
>
> (4) records subpoenaed from Dr. Davis pursuant to a grand jury subpoena.
>
> As a subset of (1), we would also expect to inspect and copy any communications between law enforcement and the relevant insurance companies and their agents, including insurance defense attorneys and their special investigative units.

---

[1] Although the Court requested that the government try to make the documents available for inspection and copying while counsel were still in St. Louis, the government stated that it was not able to make them available that day or the next. Instead, in an attempt to accommodate the government in producing the Count 2 discovery, Dr. Davis agreed to send a representative on January 26 to inspect the materials.

2

*Id.* at 3-4, Jan. 24, 2018 email from S. Doran to D. McMurtry et al.

In response, the government backtracked, yet again, from the position it had previously taken—this time on the record before the Court—and now stated that "it is not agreeing to make [communications between law enforcement and the insurance companies and their agents] available, because neither Brady, Rule 16,[] nor the Jencks Act requires the disclosure." *Id.* at 2, Jan. 25, 2018 email from D. McMurtry to S. Doran et al.

In response, and seeking to resolve this matter administratively, counsel for Dr. Davis sent the government a letter clarifying why these communications should be produced, and asked the government to reconsider its position.  Exhibit 2, Jan. 26 letter from G. Saikin to D. McMurtry. The government replied that its position had not changed, and relied on the Jencks Act to support that position.  Exhibit 1 at 1, Jan. 29, 2018 email from D. McMurtry to G. Saikin et al.

As demonstrated below, the government's withholding the communications between law enforcement and the insurance companies and their agents related to Dr. Davis (the "Communications")  is unsupportable and, moreover, contradictory to its representations to the Court.

## II. ARGUMENT

**A.     The Government's Refusal to Produce the Communications is Contrary to its Representations to the Court and the Court's Order**

At the hearing on Dr. Davis's Motion, the government represented to the Court that it would produce relevant discovery to Dr. Davis.  The Court additionally ordered the government to make the discovery available to Dr. Davis, with the exception of interview reports:

> THE COURT: So have you gone and inspected the documents?
> MR. DORAN: We have asked when we're able to do that. We've asked the ability to do that. We have been told that the Government -- on a email of January 2 that our request for these documents has caused the Government to reconsider giving them. If we're allowed to go look at them all today, we'll go –
> . . .

3

> THE COURT: Would never tell the FBI what to do, but these folks are in from out of town. It would be really helpful if they would let them come inspect the documents.
> MS. MCMURTRY: I will do that, Judge. Judge, as to -- *there are some documents, however, we are refusing to disclose, and those are interview summaries*. *We are refusing to disclose interview summaries of former employees, including chiropractors and patients.*
> . . .
> MS. MCMURTRY: Judge, *the Government is willing to disclose the insurance documents*, bank records, subpoenaed documents from Dr. Davis. What's the other one he mentioned? The recordings of the undercover between Dr. Davis and the undercover agents. *The Government is not willing to disclose the interviews of patients and chiropractors*.

Exhibit 3, Hearing Transcript at 13:1-8, 14:1-8, 19:9-15 (emphasis added).

It is clear from the hearing that the Communications must be produced. First, the government *explicitly promised to produce insurance documents*; communications by employees or agents of the insurance company would plainly fall under this category. If communications between insurance company employees and agents cannot be described as "insurance documents," we are unclear as to how they should be described.

Second, it is indisputable that the government withheld <u>**one**</u> category of documents: *the interview reports*. It is gamesmanship for the government to attempt to add categories of documents that it intends to withhold ex post facto. In attempting to re-write the Court's instruction to produce all non-interview report discovery, we submit that the government is in violation of an order of the Court.

The government suggests that Dr. Davis should have asked for the Communications with greater particularity at the hearing; once again, the government is creating a specificity standard that does not exist. *See* Exhibit 1 at 1, Jan. 29, 2018 email from D. McMurtry to G. Saikin et al. ("[Y]our current request for the disclosure of [the Communications] was made <u>**after**</u> the January 24, 2018 hearing. . . . [T]he Court was not aware of any disagreement concerning the disclosure of the Communications."). Rather, Dr. Davis made it clear several times that he had very limited

4

knowledge as to what materials were contained in the large volume of Count 2 discovery. *See* Motion at 3 (noting that counsel's request for information on what is contained in the large volume of discovery went unanswered for a fifth time).[2]  Indeed, counsel for Dr. Davis first received meaningful clarification as to what material comprised the large volume of Count 2 discovery ***after*** the hearing on the Motion to Compel.  Surely the government cannot ignore Dr. Davis's questions regarding what is in the discovery five times and then turn around and deny him access to materials on the grounds that he did not know with its desired specificity what was in the discovery.

Ultimately, the Court should consider this from the standpoint of fairness; the government made it explicit that it was withholding ***one*** category of documents.  Now it is attempting to add an additional category (which was part of the Court's order) apparently on the grounds that Dr. Davis was not specific enough in requesting them while the government was playing hide the ball. That the government never mentioned the Communications when clarifying what discovery it had—***and promising to the Court to produce all non-interview report discovery***—should not be held against Dr. Davis.  Instead, it should be held against the government; it had ample opportunities to raise this issue, either in correspondence with Dr. Davis, in the briefing on his Motion to Compel, or in oral argument before the Court.  It did not do so at any time, and it should not be rewarded for dragging out a discovery process already overly-burdened by the government's obstinacy and capriciousness.  That the government waited until *after* all these opportunities to

---

[2] *See also* Exhibit 3, at 4:23-25; 5:23-6:1; 10:10-19 ("Unfortunately, we asked the Government several times what was in that volume, that larger volume. We never received a response. . . . The material that we are missing is most likely -- because we don't have concrete answers as to what is contained in that set of discovery -- but we believe it is most likely the counterpart for Count 2 of the information to the material. . . . Additionally, the Government has focused almost exclusively in its response on the interview reports, maybe the 302s, that would be contained in the Count 2 discovery. Again, we think that is misunderstanding the issue. There is a large amount of additional discovery, as I stated, that would likely be contained, we believe, based on the fact we haven't gotten a clear answer on what's in that Count 2 discovery, but that we believe would be in the Count 2 discovery that the Government itself described as a large volume.").

have this dispute adjudicated by the Court to suddenly add a new category of documents it will not produce, requiring Dr. Davis to litigate this issue in additional briefing appears designed, yet again, to punish Dr. Davis for his efforts to obtain discovery.

**B.     The Communications Are Not All Protected as Jencks Statements**

Despite its prior claim that it has not identified any witnesses, the government is now seeking to prevent the disclosure of the Communications with the insurance companies as Jencks material.  Response to Motion at 7 ("At present, the Government *has not identified any witnesses* who will testify at the sentencing hearing and no decision has been made as to whether the Government will offer evidence at the sentencing hearing.") (emphasis added).  The government has suggested that it is significant that Dr. Davis has not previously sought Jenks material.  *See* Exhibit 1 at 1, Jan. 29, 2018 email from D. McMurtry to G. Saikin et al.  Dr. Davis's initial position regarding Jencks materials, however, was based on the government's statement that it had no witnesses identified to testify and thus had no Jencks materials.  *See* Reply in Support of Motion at 6 (noting Dr. Davis's understanding that the government's Response to the Motion suggested there were no government witnesses, and therefore no Jencks material).  Dr. Davis's position with respect to seeking Jencks material may evolve as the government's decision to call witnesses evolves.

However, leaving this aside, the universe of Communications are not protected as Jencks material, as the government claims.  Nor are they protected under Rule 16.  Communications between law enforcement and the insurance companies and their agents would include those made ***by*** law enforcement ***to*** the insurance companies, which are neither statements "made by a Government witness" nor an "internal government document," and thus are not protected by the Jencks Act or Rule 16 of the Federal Rules of Criminal Procedure.  *See* 18 U.S.C. § 3500(a); Fed. R. Crim. P. 16(a)(2).

6

Importantly, the government is still fighting Dr. Davis on producing material that it freely discloses regularly, and which ought to be disclosed under the United States Attorney's Office for the Eastern District of Missouri's ("USAO") Discovery Policy, which calls for "expansive discovery." Notably, the government has again failed to offer any reason that it is not following this policy and has not attempted to make a showing of government harm if the policy is followed. Rather, it is taking a punitive position to attempt to stymie Dr. Davis's access to discovery.

C.   **The Communications May Be *Brady* Material**

Even if some of the Communications are Jencks material, which they largely are not, they may be subject to disclosure under *Brady*. Courts have held that Jencks and *Brady* operate separately, and the *Brady* analysis is unaffected by Jencks. *See Chavis v. North Carolina*, 637 F.2d 213, 223 (4th Cir. 1980) ("We reject North Carolina's arguments that seek to avoid the impact of *Brady* . . . . The *Brady* rule applies to the production of evidence, and not to 'statements' or 'reports' as does the Jencks Act, 18 U.S.C. s 3500. Therefore, simply because the document containing the prosecutor's notes may not have been discoverable under the Jencks Act because it was not a 'statement' or 'report', it does not follow as North Carolina argues, that its failure to disclose the amended statement did not violate *Brady*."). To the extent that these statements are material to the appropriate sentence, they must be produced pursuant to *Brady*.

More specifically, Dr. Davis submits that there is a good likelihood that these statements are relevant to the 18 U.S.C. § 3553(a) factors, because they shed important light on Dr. Davis's relative culpability as compared to unindicted co-conspirators, the nature and circumstances of the offense, the characteristics of the defendant, and the seriousness of the offense, among others. For example, the partial Count 2 discovery that Dr. Davis recently received contains a cover letter to an "Investigative Presentation" by Walter Waggoner, an investigator for the National Insurance Crime Bureau ("NICB"), to FBI Special Agent Jim Appelbaum. Exhibit 4, Apr. 15, 2009 fax from

7

W. Waggoner to J. Appelbaum. The NICB is an entity created by the insurance industry to coordinate with law enforcement, and any information from the NICB to law enforcement would have presumably come from the insurance companies, just like the communications that the government is refusing to produce. That letter evidences an investigation by insurance companies into "the trio of [the law firm of] ▉▉▉▉▉▉▉▉, Mitchell Davis (David [*sic*] Chiropractic), and Dr. ▉▉▉▉▉▉▉▉[.]" It also alleges that the insurance companies have been suspicious of [the law firm of] ▉▉▉▉▉▉▉▉ and Dr. Davis "for years."

This letter—and presumably the underlying communications from the insurance companies—bears on Dr. Davis's relative culpability, as well as the nature and seriousness of the offense. That is, if the insurance companies had been investigating Dr. Davis for health care fraud issues "for years" before the referral to the FBI in 2009, why did the government ultimately bring forth one instance of patient coaching? It is because neither the insurance companies nor the government were able to identify any instances of services not being rendered, upcoding, medically unnecessary services, or other traditional health care theories, let alone patient harm. Such facts bear on the seriousness of the offense of false statements relating to health care matters. Similarly, if Dr. Davis is one member of a larger conspiracy involved in a health care offense, why was he the only individual charged? Such unanswered question are relevant to Dr. Davis's relative culpability and the need for proportional sentences. As such, these documents should be produced.

Furthermore, if Jencks material is also covered by *Brady*, Courts have held that it should be produced immediately, pursuant to the requirements of *Brady*. *See, e.g., United States v. Poindexter*, 727 F.Supp. 1470 (D.D.C. 1989) ("There is no question but that *Brady* imposes duties on the prosecution in addition to those created by the Jencks Act, and that in some cases the same evidence may be subject to both obligations. The *Brady* obligations are not modified merely because they happen to arise in the context of witness statements. The government therefore has

the obligation to produce to defendant immediately any exculpatory evidence contained in its Jencks materials, including exculpatory impeachment material, to the extent that the government is aware of such material, and it is so ordered.") (citations omitted).[3]

Thus, in this case, the NICB letter suggests strongly that the underlying communications being withheld by the government are material to a number of the 3553(a) factors, and thus to the appropriate sentence here. As such, they should be produced immediately.

### III.    CONCLUSION

The government has permitted Dr. Davis to inspect and copy the rest of the non-interview report Count 2 discovery.  It should not, however, be permitted to add to the categories it is withholding after the fact, especially where the material ought to be produced in the first place.

WHEREFORE, Dr. Davis respectfully requests that the Court order the government to produce the Communications between the government and the insurance companies and their agents relating to this matter, in accordance with the governments representations and this Court's order at the January 24, 2018, hearing, which held back only the interview reports pending further briefing.

---

[3] *See also United States v. Snell*, 899 F. Supp. 17, 21 (D. Mass. 1995) ("[W]hen two principles of law conflict with one another the criminal justice system demands that the principle favoring greater discovery in favor the accused must prevail, particularly where, as here, the principle favoring disclosure is of constitutional origin.  Put otherwise, in seeking to harmonize the Jencks act and *Brady*, it makes no sense to indulge in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one, like Jencks.") (citations omitted); *United States v. Starusko*, 729 F.2d 256, 263 (3d Cir. 1984) ("compliance with the statutory requirements of the Jencks Act does not necessarily satisfy the due process concerns of Brady.").

Respectfully submitted,

*/s/ Gregory S. Saikin*
Gregory S. Saikin
Texas Bar No. 24051281
EDMO Bar No. 24051281 *(pro hac vice)*
Samuel E. Doran
Texas Bar No. 24095762
EDMO Bar No. 24095762 *(pro hac vice)*
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002-6111
Telephone:  713.751.1600
Facsimile:  713.751.1717

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on February 1, 2018, the foregoing document was filed electronically via the Court's electronic filing system and served upon all counsel of record by means of the Court's Notice of Electronic Filing pursuant to Local Rule 5 - 2.12.

                                               /s/ *Gregory S. Saikin*